IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALYSSA MARIE VULAKH**<br><br>*Plaintiff,*<br><br>vs.<br><br>**HIGHLINE AUTOMOTIVE, INC.**<br>and<br>**HIGHLINE AUTOMOTIVE GROUP, LLC**<br><br>*Defendants.* | CASE NO.: 24-1773<br><br>CIVIL ACTION |

### JOINT PRETRIAL STIPULATION

The parties, by and through their undersigned counsel, hereby submit the following joint pretrial stipulation:

**1. Estimate of Total Time for Trial**

The parties expect that following the completion of *voir dire*, trial can be completed in two to three days.

**2. Agreed Facts**

1.  Ms. Vulakh was hired by Highline Automotive, Inc., and Highline Automotive Group, LLC (collectively referred to as "Highline") as a Business Development Center Manager ("BDCM") in or around July 20, 2022.

2.  Ms. Vulakh submitted her application for employment with Highline on July 20, 2022.

3.  Ms. Vulakh was hired at a rate of $17/hour and earned commission, and remained at this rate of pay until her separation with Highline.

1

4. Highline is a used car dealership that operates their dealership in Philadelphia, Pennsylvania.

5. Ms. Vulakh worked directly out of Highline's Philadelphia dealership at the address of 4343 Torresdale Ave. Philadelphia, PA 19124.

6. Zarhin made the decision to hire Ms. Vulakh, and in 2022 and 2023 was responsible for all hiring and firing decisions.

7. Zarhin is the sole owner of Highline.

8. Throughout her tenure at Highline, Ms. Vulakh was never subject to any progressive discipline actions or counseling.

9. As a BDCM, Ms. Vulakh was responsible for speaking with customers, setting up appointments with customers, answering phone calls, and acting in a "customer service" role.

10. In 2022 and 2023, Highline did not have a Human Resources Department.

11. In 2022 and 2023, Highline did not have a handbook that discussed discrimination, complaints of discrimination, harassment, retaliation, or sexual harassment.

12. Both Ms. Vulakh and Patrick had desks in the showroom of Highline.

13. Ms. Vulakh was out of the office approximately January 09, 2023 to January 12, 2023 as she was sick with strep throat.

14. Ms. Vulakh ended her employment with Highline on January 24, 2023.

15. Patrick was terminated by Highline and Zarhin at some point after Ms. Vulakh's separation in 2023.

16. Prior to Patrick's termination, he was not subject to any disciplinary actions or warnings of any kind.

17. Ms. Vulakh's father, Gene Vulakh ("GV"), worked for Highline for a couple of weeks prior to Ms. Vulakh's tenure, and was subsequently let go.

18. Katie O'Connell ("O'Connell") is currently employed by Highline and has been employed for Highline for over six years.

19. O'Connell currently holds the job title of Title Clerk.

20. O'Connell never handled Human Resource functions.

21. Nathan Kriegler ("Kriegler") was employed by Highline from in or about November 2021 to August 2023 as a Finance Manager.

**3. Disputed Facts**

1. Plaintiff: Shortly after Ms. Vulakh was hired, Patrick subjected Ms. Vulakh to sexually harassing, offensive, and unwelcome comments/behaviors/touching.

    a. While working in the finance office in Highline's Philadelphia dealership, Patrick made a mistake and stated "fuck me" and then looked at Ms. Vulakh and asked her "would you fuck me?" Ms. Vulakh ignored Patrick and walked away.

    b. On a frequent and regular basis, Patrick would ask Ms. Vulakh when they were "going out," when he was "coming over" to Ms. Vulakh's house and when Ms. Vulakh would "get drinks" with him. Ms. Vulakh always rejected and denied Patrick's requests.

    c. On a frequent and regular basis, Patrick would ask Ms. Vulakh if he could touch her feet. Ms. Vulakh would respond to Patrick in the negative by stating "no."

    d. On at least one occasion when Ms. Vulakh was wearing sandals, Patrick touched Ms. Vulakh's foot. In response, Ms. Vulakh asked Patrick what he "was doing" and Patrick walked away frantically.

    e. On a frequent and regular basis, Patrick would tell Ms. Vulakh that what she was wearing was "beautiful" and that due to her attire, he was "distracting him."

    f. On a frequent and regular basis, Patrick would mention "threesomes" to Ms. Vulakh and asked Ms. Vulakh if she was "into threesomes."

2. Plaintiff: Ms. Vulakh always ignored Patrick's sexual advances and comments by showing discomfort in body language and complaints. Despite this, Patrick's behavior continued.

3. Plaintiff: At the end of 2022, Ms. Vulakh made a formal complaint about Patrick's behavior to Patrick and told him that his behavior had to stop, and that she was not romantically interested in him. In response to Ms. Vulakh's complaint to Patrick, Patrick began very angry and threatened to terminate Ms. Vulakh as a result on several occasions thereafter.

4. Plaintiff: Upon Ms. Vulakh's return to Highline upon her strep throat illness, Patrick came close to Ms. Vulakh and grabbed Ms. Vulakh's hand and began rubbing her back and stated he would "take her out to feel better." Patrick then stated to Ms. Vulakh "you look uncomfortable."

    a. In response to Patrick's unwanted touching of Ms. Vulakh, Ms. Vulakh asked Patrick to leave her alone and that his behavior was not necessary.

    b. Patrick then became angry and informed Ms. Vulakh that he was "going to get rid of" Ms. Vulakh.

5. Plaintiff: Ms. Vulakh had no choice but to resign from her employment at Highline as a result of Patrick's behavior.

6. Plaintiff: Ms. Vulakh was constructively discharged from Highline on January 24, 2023.

7. Plaintiff: Zarhin operated Highline in a haphazard and dishonest manner and did not care about any laws or regulations.

8. Plaintiff: Upon receipt of the EEOC charge, Zarhin asked Grim if Ms. Vulakh was the daughter of Gene Vulakh ("GV"), Ms. Vulakh's father, an individual Grim previously worked with. Grim responded in the affirmative.

   a. Zarhin pressured Grim to reach out to GV and inform him that if Ms. Vulakh continued to proceed with her claims against Highline, Highline and Zarhin would engage in "mudslinging" against her.

   b. Zarhin specifically pressured Grim to call GV and tell him "I will get on the stand and say all these things, I don't give a shit."

   c. On August 25, 2023, Grim messaged GV at the direction of Zarhin and thereafter called GV.

      i. In the phone call, Grim, at the direction of Zarhin, attempted to intimidate GV to get Ms. Vulakh to drop her claims against Highline by stating that if Ms. Vulakh did not drop her claims, Ms. Vulakh would be the victim of harmful "mudslinging" by Highline and Zarhin.

      ii. GV replied to Grim by stating that Ms. Vulakh intended to continue to move forward with her claims against Highline.

   d. Shortly after Grim called GV, GV texted Ms. Vulakh and stated: "Talked to grim. Roman is gonna try to say you were a hoe and banging 3 mechanics, sending pics of your stuff to people, the whole bit."

  e. Shortly after Grim called GV, Grim informed Zarhin that GV told him that Ms. Vulakh was not going to back down on her claims against Highline.

  f. On September 1, 2023, at the direction of Zarhin, Grim again attempted to reach out to GV to further intimidate Ms. Vulakh from proceedings with her claims against Highline. In response, GV stated that he would not talk to Grim while there was a legal case pending.

9. Plaintiff: On September 15, 2023, and as a result of Zarhin's forceful behavior regarding Ms. Vulakh, Grim resigned from Highline.

22. Plaintiff: Zarhin was aware of Ms. Vulakh's allegations against Highline and Patrick prior to Ms. Vulakh's EEOC charge being filed.

10. Plaintiff: O'Connell witnessed inappropriate behaviors happening at Highline during Ms. Vulakh's tenure.

11. Plaintiff: Ms. Vulakh was interviewed by Eric Patrick ("Patrick"), General Manager for the BDCM role. Thereafter, Patrick recommended Ms. Vulakh's hire to Roman Zarhin ("Zarhin"), Principal/Owner.

12. Plaintiff: Throughout her tenure at Highline, Ms. Vulakh was directly supervised by Patrick, and indirectly by Zarhin.

13. Plaintiff: Zarhin served as a de facto Human Resources Manager in 2022 and 2023 for Highline.

14. Plaintiff: On December 27, 2022 at 11:58am, Patrick texted Ms. Vulakh stating "can I call you baby.lol." Ms. Vulakh responded "No sir."

15. Plaintiff: Following her separation from Highline, Ms. Vulakh filed her EEOC Charge of Discrimination on July 13, 2023 against Highline.

23.     Plaintiff: James Grim ("Grim"), General Manager, submitted his application of employment with Highline on March 17, 2023.

24.     Plaintiff: Grim was originally hired as a Salesman for Highline.

25.     Plaintiff: Prior to being hired at Highline, Grim had over 30 years of experience in the automotive sales industry.

26.     Plaintiff: In or about June 2023, Grim was promoted to General Manager after the termination of Patrick.

27.     Plaintiff: In or about August 2023, Zarhin, upon receipt of the Ms. Vulakh's EEOC charge, showed a copy of the charge to Grim.

28.     Plaintiff: On September 15, 2023, Grim resigned from Highline.

29.     Plaintiff: Ms. Vulakh told Kriegler that Patrick was making sexual advances towards her.

30.     Plaintiff: Kriegler did not relay Ms. Vulakh's complaint about Patrick to anyone.

**4. Parties' Respective Claims and Defenses**

All legal issues are disputed for purposes of trial.

Plaintiff:

Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 200d et seq.) (gender/sex discrimination, hostile work environment, and retaliation) and the Pennsylvania Human Relations Act ("PHRA") (mirroring claims). It is well established that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." *Meritor Savs. Bank FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms,

7

conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

The analysis under Title VII and the PHRA are identical, as Pennsylvania courts have construed the protections of the two acts interchangeably. *Weston v. Pennsylvania Dep't of Corrections,* 251 F.3d 420, 426 n. 3 (3d Cir.2001) *see also Tomasso v. Boeing Co.,* 445 F.3d 702, 704 (3d Cir.2006) (applying the *McDonnell Douglas* framework to the plaintiff's PHRA claims); *Barbosa v. Tribune Co.,* 2003 U.S. Dist LEXIS 19483, at *11 (E.D.Pa. 2003).

For claims under Title VII and the PHRA, in the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of discrimination indirectly following the burden shifting analysis set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278-79 (3d Cir.2000).

    a) <u>Gender/Sex Discrimination</u>

In order to establish a *prima facie* case of discrimination for gender/sex discrimination, the plaintiff must demonstrate that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) under circumstances that give rise to an inference of unlawful sex-based discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). The last element also requires that the plaintiff demonstrate a causal connection between her protected status and the allegedly adverse action. *Id*. at 798. The key focus of the prima facie test is "always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Id*. The elements of the prima facie case "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).

b) <u>Hostile Work Environment</u>

An employer may be liable for discrimination under Title VII if an employee is subjected to a hostile work environment. A hostile work environment exists when the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

The Third Circuit has held that to succeed on a claim for hostile work environment, a plaintiff must prove that: (1) the plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in that position; and (5) the existence of respondeat superior liability. *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir. 1999); *see also Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 276-77 (3d Cir. 2001).

In determining the existence of a hostile work environment, the totality of the circumstances must be examined. *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir. 2001). "[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment." *Cardenas,* 269 F.3d at 261-62 (citing *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 148-49 (3d Cir.1999); *Aman,* 85 F.3d at 1081-84.

c) <u>Retaliation</u>

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Treaster v. Conestoga Wood Specialties, Corp.*, 4:09-CV-00632, 2010 U.S. Dist. LEXIS 63257, at *98 (M.D. Pa. April 29, 2010).

Defendants:

5. **Relief Sought**

    Plaintiff:

    a. Monetary Damages

        i. Back Pay

        ii. Front Pay

        iii. Emotional Distress

        iv. Punitive Damages

        v. Attorneys' Fees and Costs

6. **List of Lay and Expert Witnesses and The Subject of Their Testimony.**

    Plaintiff's Witness List

    - Plaintiff, Alyssa Vulakh
      Address: c/o Karpf, Karpf & Cerutti P.C.
      Ms. Vulakh will testify to all of the allegations as listed in her First Amended Complaint as well as the damages she suffered.

    - Roman Zarhin
      Address: c/o Law Offices of Dimitri Smirnov, P.C.
      Mr. Zarhin will testify to Defendants policies and procedures, his job duties and responsibilities, his management of employees, Ms. Vulakh's lack of disciplinary history, Ms. Vulakh's dates of employment, complaints received regarding Mr. Patrick's behavior, and his actions following Ms. Vulakh's separation.

- Eric Patrick
  Last Known Address: 9955 Alicia St. Philadelphia, PA 19115
  Mr. Patrick will testify as to his job duties with Defendants, his supervision of employees within Defendants, his work history with Defendants, his dates of employment with Defendants, and his reason for termination, his supervision of Ms. Vulakh, and his behavior towards Ms. Vulakh.

- Nathan Kriegler
  Address: 420 West Street Road Warminster, PA 18966
  Mr. Kriegler will testify as to his job duties with Defendants, his work history with Defendants, his dates of employment with Defendants, and any behavior he witnessed between Mr. Patrick and Ms. Vulakh.

- Katie O'Connell
  Address: 8226 Narvon St. Philadelphia, PA 19136
  Ms. O'Connell will testify as to her job duties with Defendants, her work history with Defendants, her dates of employment with Defendants, any behavior she saw between Mr. Patrick and Ms. Vulakh, Defendants' response to Ms. Vulakh's complaints, and discussions about Ms. Vulakh following her separation from Defendants.

- James Grim
  Last known Address: 145 Richards Ave. Maple Shade, NJ 08052
  Mr. Grim will testify as to his job duties with Defendants, his supervision of employees within Defendants, his work history with Defendants, his dates of employment with Defendants, discussions about Ms. Vulakh following her separation from Defendants and the intimidation forced by Defendants to get Ms. Vulakh to drop her lawsuit.

Plaintiff and Defendants further reserves the right to call any other witnesses that may serve as appropriate rebuttal/impeachment witnesses depending upon the testimony in this matter at trial.

7. **Exhibits**

   a. <u>Joint Exhibits</u>

| **Exhibit Number** | **Description with Bates Stamp (If Applicable)** |
|---|---|
| J-1 | Deposition Transcript of Katie O'Connell |
| J-2 | Deposition Transcript of Nathan Kriegler |
| J-3 | Deposition Transcript of Roman Zarhin |
| J-4 | Plaintiff New Hire Sheet; D003 |

11

| | |
|---|---|
| J-5 | July 20, 2022, Application for Employment of Plaintiff; D004-005 |
| J-6 | Plaintiff Resume Submitted to Defendants; D006-007 |
| J-7 | James Grim New Hire Sheet; D008 |

b. <u>Plaintiff's Exhibits</u>

| Exhibit Number | Description with Bates Stamp (If Applicable) |
|---|---|
| P-1 | December 27, 2022, text from Eric Patrick to Plaintiff; P004 |
| P-2 | September 01, 2023 Text message between Gene Vulakh and James Grim; P005 |
| P-3 | Text messages between Gene Vulakh and Plaintiff; P006 |
| P-4 | August 25, 2023, Facebook messages between James Grim and Gene Vulakh; P007 |
| P-5 | September 26, 2023 Certification of James Grim; P001-003 |
| P-6 | March 17, 2023 James Grim Application for Employment; D012-D013 |
| P-7 | Payroll Summary Report for Plaintiff; D112-D167 |

Plaintiff further reserves the right to use any exhibits identified by Defendants, and to amend this Exhibit List as permitted by the F.R.C.P. and as necessary.

c. <u>Defendants' Exhibits</u>

| | |
|---|---|
| **D-1** | Ledger of payments made to Plaintiff |
| **D-2** | Text messages/Facebook messages as produced by Plaintiff in discovery. |
| **D-3** | Reserved for cross examination of Plaintiff's exhibits and/or for use of exhibits set forth in Plaintiff's disclosure. |

8. **Any other Required FRCP 26(a)(3) Disclosure**

   N/A

9. **Proposed *voir dire* questions, jury instructions, and jury verdict forms**

   Please see the attached submissions.

Stipulated on the dates listed below:

                                 **KARPF, KARPF & CERUTTI, P.C.**

*/s/ Benjamin D. Salvina*
Benjamin D. Salvina, Esq.
Jordyn N. Kopcow, Esq.
8 Interplex Drive
Suite 210
Feasterville-Trevose, PA 19053
Tel: (215) 639-0801
Fax: (215) 639-4970
bsalvina@karpf-law.com
jkopcow@karpf-law.com
Attorneys for Plaintiff

**Law Offices of Dimitri Smirnov, PC**

*/s/*
Dimitri Smirnov, Esq.
306 Lakeside Drive
Southampton, PA 18966
Tel: (267) 684-6880
Fax: (215) 975-1440
dimitri@smirnovlaw.com
Attorney for Defendants

Dated: May 20, 2025

13